```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                     FOR THE DISTRICT OF ALASKA
 3   JERRY MANN,                    )
                                    )
 4              Plaintiff,          )
                                    )
 5   v.                             )
                                    )
 6   HARTFORD INSURANCE COMPANY OF  )
     THE MIDWEST,                   )
 7                                  )
                Defendant.          )
 8   _____)
     Case No. A05-0038 (RRB)
 9
                    DEPOSITION OF JERRY W. MANN
10
                         December 8, 2005
11
     APPEARANCES:
12
        FOR THE PLAINTIFF:      MR. LEONARD T. KELLEY
13                              Kelley and Canterbury
                                Attorneys at Law
14                              821 N Street, Suite 206
                                Anchorage, Alaska 99501
15                              (907) 276-8185
16      FOR THE DEFENDANT:      MR. PETER J. MAASSEN
                                Ingaldson, Maassen & Fitzgerald
17                              Attorneys at Law
                                813 West 3rd Avenue
18                              Anchorage, Alaska  99501
                                (907) 258-8751
19
20
21
22
23
24
25
```

JERRY W. MANN  12/8/2005  MANN v. HARTFORD INS.
Vol. 1  A05-0038 Civil

Page 2

1  TABLE OF CONTENTS
2  Direct Examination by Mr. Maassen  04
3  Cross Examination by Mr. Kelley  44
4  EXHIBITS MARKED:
5  A - Hartford's First Discovery Requests to Plaintiff  12
6  B - Supplemental Application  21
7  C - Affidavit  27
8  D - Change Section RE: UIM Coverage page  40

Page 3

1  PROCEEDINGS
2  (Anchorage, Alaska - 12/8/2005)
3  (On record)
4  REPORTER: My name is Salena Hile, Notary Public in the
5  state of Alaska and court reporter for Computer Matrix Court
6  Reporters whose business address is 310 K Street, Suite 200,
7  Anchorage, Alaska. This is the first tape in the audiotape
8  deposition of Jerry Mann taken pursuant to notice by the
9  defendant. The case is in the United States District Court for
10  the District of Alaska, case number A05-0038, Mann versus
11  Hartford. Today is December 8, 2005 and the time scheduled for
12  deposition is 1:30 p.m. We are at the offices of Ingaldson,
13  Maassen & Fitzgerald located at 813 West 3rd Avenue, Anchorage,
14  Alaska.
15  (Off record)
16  (On record)
17  REPORTER: Counselors, please identify yourselves for the
18  record and who you represent starting with the plaintiff's
19  attorney.
20  MR. KELLEY: Len Kelley for Mr. Mann.
21  MR. MAASSEN: Peter Maassen for the defendant.
22  REPORTER: All right, thank you. Mr. Mann, can you please
23  raise your right hand.
24  (Oath administered)
25  MR. MANN: I do.

Page 4

1  REPORTER: Thank you.
2  JERRY W. MANN
3  having first been duly sworn under oath, testified as follows
4  on:
5  DIRECT EXAMINATION
6  REPORTER: Please state your full name for the record and
7  spell your last name for me.
8  A  Jerry Wren, W-R-E-N, Mann, M-A-N-N.
9  REPORTER: And a mailing address, please.
10  A  P.O. Box 241765 Anchorage 99524.
11  REPORTER: And how about a daytime telephone number or a
12  message phone where you could be contacted.
13  A  522-9669.
14  REPORTER: All right, thank you. Okay, Mr. Maassen.
15  BY MR. MAASSEN:
16  Q  Mr. Mann, have you ever had your deposition taken before?
17  A  Yes.
18  Q  On what occasion?
19  A  Relating to the accident I had.
20  Q  Okay. The accident in 2004 that was, or 2003?
21  A  2003, I think, yeah.
22  Q  Okay. Was it taken just once in that case?
23  A  Yeah.
24  Q  Do you recall the name of the lawyer who took your
25  deposition?

Page 5

1  A  No.
2  Q  Was Mr. Kelley representing you in that proceeding?
3  A  Yes.
4  Q  Okay. Was that the only occasion in which you had a
5  deposition taken?
6  A  (Nods affirmatively)
7  Q  Yes, okay. You need to answer audibly so that she can get
8  your answer for the record.
9  A  Oh, yes.
10  Q  Okay.
11  A  Well, I -- there was one before that. Several years ago
12  the landlord didn't shovel the roof on the building where
13  I leased a space and it destroyed all my equipment so that
14  was back in the early '90s or something.
15  Q  Okay. And there was a lawsuit involving that loss?
16  A  Yes.
17  Q  Okay.
18  A  Just recovering my equipment.
19  Q  And you gave testimony under oath in that case as well?
20  A  Yes.
21  Q  Did you ever have a occasion, either in those cases or any
22  other time to give testimony in court?
23  A  In that case, yes.
24  Q  Okay, in the roof case?
25  A  Yes.

2 (Pages 2 to 5)

Computer Matrix, LLC  Phone - 907-243-0668  jpk@gci.net
310 K Street, Suite 200  Fax  907-243-1473  sahile@gci.net

EXHIBIT  1  PAGE  2  OF  14

JERRY W. MANN                12/8/2005                MANN v. HARTFORD INS.
Vol. 1                                                              A05-0038 Civil

Page 6

1  Q  There was a trial in that case?
2  A  Yes.
3  Q  And that was how many years ago?
4  A  I don't recall, it was in the early '90s, I think.
5  Q  Were you represented by a lawyer in that proceeding?
6  A  Yes.
7  Q  And how did it turn out for you?
8  A  I won.
9  Q  I can't help but notice that you have an oxygen apparatus
10    on, can you tell me what the purpose of that is?
11 A  To help my breathing.
12 Q  Okay. Are you taking any medications today that you think
13    might affect your ability to understand the questions that
14    I ask?
15 A  I take -- take valium and Prednisone.
16 Q  Do you think any of those medications might affect your
17    ability to understand my questions and to answer
18    truthfully?
19 A  I don't know about truthfully but I have trouble
20    remembering details.
21 Q  Okay. If, at any point during this process you have
22    trouble understanding what I'm asking you, please don't
23    hesitate to tell me.....
24 A  Okay.
25 Q  .....so that we can make sure we're on the same wave

Page 7

1     length at all times, okay?
2  A  Sure.
3  Q  And if at any time you want to take a break for any reason
4     at all, just let me know that as well.
5  A  Okay.
6  Q  Are you currently employed?
7  A  I was. But I lost my -- I had a vocational school but I
8     lost it about a month ago.
9  Q  Okay. Where was the vocational school?
10 A  I had it housed inside a manicurist shop.
11 Q  What was the vocational training that you offered?
12 A  Manicuring.
13 Q  And were you the owner of the school?
14 A  Yes.
15 Q  Were you the instructor as well?
16 A  No.
17 Q  Did you hire instructors?
18 A  Yes. A lady who ran the shop.
19 Q  Okay. And how did it come about that you lost the school?
20 A  I -- we had some zoning issues and had to move to a new
21    facility and I had trouble following through with the
22    paperwork and missed a deadline and they revoked my
23    license.
24 Q  When you say they revoked your license, what license is it
25    that was revoked?

Page 8

1  A  My school license.
2  Q  Okay. So you have to be licensed by the State authorities
3     in order to.....
4  A  Yes.
5  Q  .....operate the vocational training school? How long had
6     you been operating the vocational training school?
7  A  Since 1972.
8  Q  What was the name of the school?
9  A  Cimarron, C-I-M-A-R-R-O-N Tech, T-E-C-H School.
10 Q  Okay. Did you offer other subjects during that time
11    besides manicuring?
12 A  Not at that particular time. I had offered other courses
13    in the past.
14 Q  Okay. During the entire lifetime of the school, from '72
15    through the present, it offered courses other than
16    manicuring?
17 A  Yes.
18 Q  And what sorts of other courses were offered?
19 A  In 1972 I started in Oklahoma, and I worked -- my
20    background was in special education and speech and hearing
21    and I designed programs for the learning disabled. I did
22    job -- job training, job readiness, job placement work,
23    adjustment, those type services.
24 Q  Okay.
25 A  And I did that from '72 until 1990. Moved up here and

Page 9

1     started in 1991 in the state of Alaska, was licensed in
2     1991.
3  Q  Okay. Could you give me a brief description of your
4     educational background, your education and training?
5  A  Just college at, I think about a 160 hours in special
6     education, speech and hearing.
7  Q  Did you get a degree?
8  A  No, I never -- never finished my degree. All I needed to
9     do was my practice teaching but I didn't want to be a
10    school teacher, I wanted to be able to design my own
11    programs.
12 Q  Okay.
13 A  But I had more than enough hours, I think, to graduate.
14 Q  Are you currently married?
15 A  No.
16 Q  Do you have children?
17 A  Yes.
18 Q  Do you have children who live in Alaska?
19 A  Two.
20 Q  Okay. Are they grown?
21 A  Yes.
22 Q  And just what are their names?
23 A  Adam and Monica.
24 Q  Last name Mann for both of them?
25 A  Yes.

3 (Pages 6 to 9)

JERRY W. MANN
Vol. 1
12/8/2005
MANN v. HARTFORD INS.
A05-0038 Civil

Page 10

1  Q  And I know that what brought us here today initially was
2     this accident that you had in 2003 and I don't really know
3     much about that accident, could you give me just a
4     thumbnail sketch of what happened?
5  A  I was driving eastbound down 36th Street and when I
6     approached the intersection of 36th and Old Seward, a
7     young lady made a left turn in front of me and I ran into
8     the side of her car, couldn't stop and totalled my
9     Suburban.
10 Q  Okay. And what injuries did you suffer as a result of
11    that accident?
12 A  Back injuries. Bleeding lungs.
13 Q  Were you hospitalized?
14 A  No. I went to the emergency room, spent several hours in
15    the emergency room.
16 Q  Now, it's my understanding from correspondence with your
17    Counsel, and I guess this is directed more to him than to
18    you.
19    MR. MAASSEN: But if there comes a point in the litigation
20    which there well may, that I need to more thoroughly
21    investigate Mr. Mann's damages I'll be able to ask him
22    specifically about those issues later on and today we're
23    focused on.....
24    MR. KELLEY: Whatever issue you want to focus on is fine
25    with me.

Page 11

1     MR. MAASSEN: Yeah.
2     MR. KELLEY: I'm not -- in other words, if you want to
3     talk to him later on down the road, if we do an arbitration,
4     fine.
5     MR. MAASSEN: Okay, that's what I thought.
6  Q  What we're mostly here to talk about is insurance
7     coverage, as you probably know, since I represent The
8     Hartford. You gave us -- oh, I guess I should ask first.
9     You had some health problems before the accident in 2003;
10    is that fair to say?
11 A  What, you mean my lungs?
12 Q  Yeah. Just in general?
13 A  Yes.
14 Q  Okay.
15 A  Just my lungs.
16 Q  And what is the lung condition that you're suffering from?
17 A  Emphysema.
18 Q  And how long have you suffered from that?
19 A  Seven or eight years, probably.
20 Q  And did the accident, did that have an effect on the
21    emphysema, did it aggravate your emphysema?
22 A  It didn't aggravate it as such, it just -- well, it did at
23    the time because my lungs were bleeding. I had quite a
24    bit of bleeding to my lungs. And had a lot of chest
25    pains, ribs and everything, bruised.

Page 12

1  Q  Okay. I'm going to make a couple of documents exhibits
2     here, the first one is some discovery responses.
3     MR. MAASSEN: If you could mark that as the first exhibit,
4  please.
5     REPORTER: Okay, do you want A?
6     MR. MAASSEN: Sure, whatever works for you.
7     REPORTER: Okay, A.
8          (Deposition Exhibit A marked)
9  Q  I'm showing you a document that's marked as Exhibit A.
10 A  I didn't bring my glasses, I'm going to have trouble
11    reading this.
12 Q  Would it help if I loaned you mine, they're just the
13    Barnes & Noble off the shelf reading glasses?
14 A  I can try.
15 Q  Okay. I'll try to get along without them, does that help?
16 A  Yes, uh-huh.
17 Q  Good. Extra charge for that.
18    (Laughter)
19 Q  If you'll look at Page 6, please, it's the signature page,
20    and that's your signature that appears more less in the
21    middle of the page, isn't it?
22 A  Yes, uh-huh.
23 Q  Do you recall reviewing these and signing them within the
24    last month or so?
25 A  No.

Page 13

1  Q  No, you don't. Do you have any doubt that you did so?
2  A  Yes, I'm -- that's my signature.
3  Q  Okay. So can we reasonably assume that these answers are
4     ones that you reviewed and signed within the last month or
5     so?
6  A  Which -- which answers?
7  Q  I'm sorry, this document is entitled responses to
8     defendant Hartford's First Discovery Requests to
9     Plaintiff, and these are what are represented to be your
10    answers to questions that I asked you through your
11    Counsel. And do you have any question as to whether or
12    not these really are your answers to those discovery
13    requests?
14 A  If my attorney says they are, they are.
15 Q  Okay. Well, we'll.....
16    MR. KELLEY: You have to understand, this is not my
17    deposition.
18 A  Okay.
19    MR. KELLEY: It is your deposition so.....
20 Q  We'll just hit the specifics that I need to get to
21    and.....
22 A  Okay.
23 Q  .....I'll skip over the.....
24 A  I apologize but I have trouble remembering things.
25 Q  No, that's okay, it's quite all right.

4 (Pages 10 to 13)

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

EXHIBIT  1   PAGE  4  OF  14

JERRY W. MANN
Vol. 1
12/8/2005
MANN v. HARTFORD INS.
A05-0038 Civil

Page 14

```
 1     MR. KELLEY: No, problem, Jerry, but this is your
 2  deposition.
 3  A  Okay. Okay.
 4  Q  If you look at Page 2, please.
 5  A  Yes.
 6  Q  And interrogatory, the one toward the bottom there, it
 7     says, identify the insurance carriers other than Hartford
 8     with whom you and/or your wife had automobile liability
 9     insurance from 1990 through the present. And then could
10     you just take the time to read to yourself the answer
11     given there.
12  A  Is that all of it?
13  Q  Yeah, that's all of it, it doesn't go on to the next page.
14  A  Okay. Okay.
15  Q  Does that seem accurate to the best of your recollection?
16  A  Yes, uh-huh.
17  Q  Okay. So when you were married in 1990 you were listed on
18     your wife's policy?
19  A  Yes.
20  Q  And you don't recall the name of that policy?
21  A  No. No.
22  Q  Do you recall whether you had uninsured motorist's
23     coverage under that policy?
24  A  No.
25  Q  Do you recall why you changed from that company to
```

Page 15

```
 1     whatever the next one was, Progressive?
 2  A  Cheaper.
 3  Q  Okay. Other than cost, do you remember any
 4     dissatisfaction with the coverage that you had with the
 5     first company that's listed here?
 6  A  No.
 7  Q  And it says that you switched to Progressive in May of '97
 8     and had them for a year, and you don't recall whether you
 9     had uninsured motorist's coverage with Progressive; is
10     that correct?
11  A  No, I don't know.
12  Q  Okay.
13  A  I assume I did but I don't remember.
14  Q  Do you recall, again, why you changed from Progressive to
15     GEICO after a year with Progressive?
16  A  Because they had a better price.
17  Q  Okay. So other than cost, again, you don't recall any
18     dissatisfaction.....
19  A  No.
20  Q  .....with the.....
21  A  No.
22  Q  .....GEICO coverage.....
23  A  No.
24  Q  .....I mean with the Progressive coverage?
25  A  No.
```

Page 16

```
 1  Q  Okay. So it's fair to say that when you're looking at
 2     liability -- automobile insurance, cost is a pretty
 3     important factor to you?
 4  A  Yes.
 5  Q  Are there other factors that are important in your
 6     consideration of what insurance coverage you're going to
 7     get for your driving?
 8  A  Other than just wanting to have a good reputable major
 9     company.
10  Q  Okay. And in 2001 you signed up with The Hartford, and I
11     want to get everything I can about what you recall of
12     that, and basically the same question first, I guess. Was
13     there any dissatisfaction you had with GEICO that caused
14     you -- did I ask you this already -- that caused you to
15     switch to Hartford?
16  A  Same. Same issue, money.
17  Q  It was price?
18  A  Yeah.
19  Q  Do you recall how you heard about The Hartford automobile
20     insurance coverage?
21  A  Through AARP.
22  Q  And through what from AARP, a publication?
23  A  A publication, just a newsletter. As a member of AARP
24     they're always sending out literature on different issues
25     and Hartford was one of them.
```

Page 17

```
 1  Q  Okay.
 2  A  So when I called Hartford they gave me an excellent price
 3     and big savings.
 4  Q  Okay. I think I asked you also in these discovery
 5     requests what you remember about that call to Hartford, or
 6     maybe I didn't. Do you recall whether you were -- did you
 7     make the call yourself to Hartford to get the coverage the
 8     first time?
 9  A  No, I sent in a questionnaire, and I remember because they
10     gave me a free little clock for sending in the
11     application.
12  Q  Okay.
13  A  So I can't remember if it was me that initiated the call
14     or if it was the company.
15  Q  Okay.
16  A  I think it was probably company initiated but I don't
17     remember.
18  Q  So whatever it was that you read in this publication about
19     The Hartford insurance, did it -- was it one of these
20     things where it said send in this form and we'll send you
21     a clock?
22  A  Well, it was a cheap little clock but it was mainly the
23     insurance I was interested in.
24  Q  Okay.
25  A  Because I had a friend that had told me that as a member
```

5 (Pages 14 to 17)

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax   907-243-1473
jpk@gci.net
sahile@gci.net

EXHIBIT  1   PAGE  5  OF  14

Page 18

1  of AARP that Hartford had a special program for senior
2  citizens and you could save a lot of money on insurance.
3  Q  Okay.
4  A  So that was my reason, was the money, not the clock.
5  Q  Right. You probably already had a clock.
6  A  Yeah, right, it was this little cheap thing made in China.
7  Q  So you sent in the questionnaire and then as you recall
8     someone called you on the phone from Hartford?
9  A  I don't remember. I'm sure they did because I would not
10    have -- I would not have called them so I'm sure they
11    called me from the card I mailed in.
12 Q  Okay. Do you recall -- I don't suppose you recall the
13    name of the person you spoke to at Hartford?
14 A  No. No.
15 Q  Do you recall whether it was a man or a woman?
16 A  No.
17 Q  Do you recall how long the call was?
18 A  No.
19 Q  Do you remember any particular aspects of insurance that
20    you talked about during the phone call?
21 A  Just that my bank had told me that I had to have full
22    coverage because I financed a '93 Suburban so I had to
23    have full coverage.
24 Q  And when you say, full coverage, you meant coverage that
25    would cover damage to the '94 Suburban?

Page 19

1  A  '93.
2  Q  '93 Suburban.a
3  A  Yes, uh-huh.
4  Q  Did you have your existing policy with GEICO at hand when
5     you talked to the Hartford person, do you know?
6  A  No, I don't recall, I'm sure I didn't.
7  Q  Do you recall whether the Hartford person asked you what
8     coverages you had at present?
9  A  No, I don't remember.
10 Q  Okay. Other than making sure that you had coverage that
11    would satisfy the bank, was there anything else about the
12    coverage that you wanted to change when you signed up with
13    Hartford, moving from Progressive to Hartford?
14 A  I didn't have -- I think I just had liability and possibly
15    uninsured motorist, and underinsured motorist's with
16    Progressive, but I didn't have the collision.
17 Q  Okay. So you wanted to make sure you had collision
18    coverage?
19 A  Yeah. And uninsured motorist's and everything the bank
20    required.
21 Q  Okay. Did the bank require uninsured motorist's coverage?
22 A  Yes, they told me I had to have full coverage, had to have
23    everything so.....
24 Q  When they said full coverage, you took that to mean
25    including uninsured motorist's coverage?

Page 20

1  A  Yes.
2  Q  And why did you think that that included uninsured
3     motorist's coverage, did they say uninsured motorist's
4     coverage specifically or did they just say full coverage?
5  A  Full coverage. I assume that to -- to be everything,
6     which would include that.
7  Q  Did you take any notes or anything of your first
8     conversation with Hartford?
9  A  No.
10 Q  Any writing that would reflect what was said in that
11    conversation.....
12 A  No.
13 Q  .....either by you or by them?
14 A  No.
15 Q  And what was your understanding of what was going to
16    happen after this conversation occurred with the Hartford
17    person on the telephone?
18 A  They were going to immediately either -- I think fax a
19    copy of the insurance to my bank or mail it or something.
20 Q  Okay.
21 A  To show that I -- I had coverage.
22 Q  Okay.
23 A  Or it could have been a telephone call. I honestly can't
24    remember.
25 Q  Okay. But it was important that they contact the bank

Page 21

1     immediately so that the bank knew that you had coverage
2     for the automobile?
3  A  Yes.
4  Q  Okay. Because that was important to the loan you had in
5     order to purchase the automobile?
6  A  Correct. To be able to drive it.
7  Q  Okay. And besides the phone call, what else -- the phone
8     call or whatever communication they were going to make
9     with the bank, what else did you expect Hartford to do at
10    that point?
11 A  Nothing. Just send me the little card to put in my glove
12    box showing I had insurance.
13 Q  Okay. Was it your understanding that there was still an
14    application form or something that you needed to sign
15    after this telephone call occurred?
16 A  No, I wasn't aware of that.
17 Q  Okay. Do you recall getting an application form in the
18    mail after that?
19 A  I got some paperwork, I don't recall what all was in it.
20 Q  Okay.
21    MR. MAASSEN: Mark this as the next exhibit.
22    REPORTER: B.
23         (Deposition Exhibit B marked)
24 Q  I'm showing you something that's been marked as Exhibit B.
25 A  Okay.