JERRY W. MANN
Vol. 1
12/8/2005
MANN v. HARTFORD INS.
A05-0038 Civil

Page 22

1  Q  And if you'd just take a few minutes and page through it
2     I'd appreciate it.
3  A  Okay.
4  Q  On the first page you can see that there's a stamp, it's
5     kind of crooked toward the bottom there and it appears to
6     be a date, April 12, '01, do you see that stamp, it's like
7     a date received stamp in the lower right-hand corner?
8  A  Oh, here?
9  Q  April 12, '01.
10 A  Okay.
11 Q  And I'm assuming that it was sometime before that in early
12    '01 that you would have received either this document or
13    portions of this document; is that consistent with your
14    recollection?
15 A  I don't recall.
16 Q  Okay. Well, let's look at Page 8, the very last page of
17    the document, and that's your signature at the bottom of
18    the page, isn't it?
19 A  Yes, uh-huh.
20 Q  And it's dated April 8, '01?
21 A  Yes.
22 Q  Okay. And then at the top there's a shaded area and it
23    says the full name of your auto insurance company and it
24    says GEICO; is that your handwriting there, did you write
25    in the word, GEICO?

Page 23

1  A  Yes.
2  Q  And the expiration date, I assume you wrote that in as
3     well?
4  A  Yeah.
5  Q  Okay. Does that refresh your recollection as to when you
6     would likely to have seen, at least, this portion of this
7     application form, would it have been in early April '01?
8  A  Yes, if -- if that's when I signed it, it would be, yes.
9  Q  Okay. And let's look at the preceding page, Page 7.
10 A  Okay.
11 Q  There's a box that's titled change section and then toward
12    the bottom it says -- there's a checkmark in one of the
13    boxes there.....
14 A  Uh-huh. (Affirmative)
15 Q  .....next to include comprehensive and collision coverage
16    for damage to a rental vehicle, and then that's your
17    signature at the bottom of the page, isn't it?
18 A  Correct, uh-huh.
19 Q  And, again, it's dated April 8, '01?
20 A  Correct.
21 Q  And do you believe that to be your checkmark in the box
22    there?
23 A  Yes, uh-huh.
24 Q  Do you recall receiving something from Hartford around the
25    time you signed these pages of the document that told you

Page 24

1     what insurance you were buying and what it would cost?
2  A  No.
3  Q  You don't.....
4  A  No.
5  Q  .....okay. Looking specifically at the first page where
6     it says coverages and your total policy premium, do you
7     recall receiving that information in April of '01 from The
8     Hartford?
9  A  No.
10 Q  If you'd turn -- well, look at Page 2, this lists the two
11    vehicles that were covered under the policy when you first
12    purchased it, an '88 Pontiac Grand Am and a '77 GMC?
13 A  Uh-huh. (Affirmative)
14 Q  And is that information correct, not all of it.....
15 A  Uh-huh. (Affirmative)
16 Q  .....just the -- I don't care about the serial numbers and
17    stuff.....
18 A  Yeah.
19 Q  .....just in general they're the right vehicles?
20 A  Yes.
21 Q  Do you recall getting some written confirmation from
22    Hartford in April of '01 confirming what vehicles were
23    being covered by the insurance that you were purchasing?
24 A  They sent me the cards and -- and a policy of some type.
25 Q  Okay. On Page 3, if you'd take a look there, please.

Page 25

1  A  Okay.
2  Q  There's a shaded are where it says state, AK, and then
3     years licensed in state, 1990.
4  A  Okay.
5  Q  And that's presumably the year in which you were first
6     licensed in Alaska. Do you believe that to be your
7     writing, writing in that date there?
8  A  Yes.
9  Q  Okay. And do you recall seeing this page before?
10 A  No.
11 Q  Okay. The next page is entitled information about your
12    driving history, and, again, there's a shaded area in the
13    middle there and there's a checked box where it says no,
14    you haven't had any accidents, violations, thefts or
15    vandalisms; do you believe that to be your checkmark in
16    that box?
17 A  Yes.
18 Q  Okay. So are you reasonably certain then that at some
19    point around April of '01 you received at least Pages 3,
20    where your handwriting appears; four, where your checkmark
21    appears; and seven and eight where your signature appears?
22 A  Would you rephrase the question?
23 Q  Sure. I'm just wondering what we can be sure about, at
24    least, to some reasonable probability and can we be
25    reasonably certain based on what you've seen here, that in

7 (Pages 22 to 25)

Computer Matrix, LLC
310 K Street, Suite 200
Phone - 907-243-0668
Fax    907-243-1473
jpk@gci.net
sahile@gci.net

EXHIBIT __1__ PAGE __7__ OF __14__

JERRY W. MANN  
Vol. 1  
12/8/2005  
MANN v. HARTFORD INS.  
A05-0038 Civil

Page 26

```
 1     April of '01, somewhere around there.....
 2  A  Yeah.
 3  Q  .....you, at least, saw Pages 3 where the date
 4     appears.....
 5  A  Yeah.
 6  Q  .....four, where that checkmark appears; and seven and
 7     eight where your signature appears?
 8  A  Yes.
 9  Q  Okay.
10  A  I signed it so I'm sure that I did.
11  Q  Okay.
12  A  I just don't remember it, but.....
13  Q  So you wouldn't be able to recall the form in which it
14     arrived, whether it was.....
15  A  No.
16  Q  .....folded or in an envelope.....
17  A  No.
18  Q  .....or with other materials?  Do you recall when it was
19     that you sent in a payment for your insurance, was it.....
20  A  No.
21  Q  .....after the phone call?
22  A  It would have been after the phone call, yes.
23  Q  Okay.  But I mean after the phone call and before you
24     filled out any additional paperwork?
25  A  I'm sorry, would you repeat that?
```

Page 27

```
 1  Q  I'm just wondering.....
 2  A  They -- they sent me a bill, I'm sure that after I --
 3     after they sent the paperwork they sent me a bill, I sent
 4     them a check and I don't -- think it would be pretty
 5     standard, I guess.
 6  Q  Okay.  So looking at -- I want you to take a look at
 7     another exhibit here.
 8     MR. KELLEY:  C?
 9     REPORTER:  Yes, C.
10     MR. MAASSEN:  Thank you.
11            (Deposition Exhibit C marked)
12  Q  It's a document that's been marked Exhibit C.
13  A  Did you want me to read this?
14  Q  If you could just scan through it so I can ask you
15     whether.....
16  A  Okay.
17  Q  .....it's -- you know, just ask you a few general
18     questions about it.
19     (Off record)
20     (On record)
21  Q  Okay, Mr. Mann, did you have a chance to look at Exhibit
22     C?
23  A  Yes.
24  Q  And that's your signature on the second page of it, isn't
25     it?
```

Page 28

```
 1  A  Yes.
 2  Q  And do you recall signing this affidavit on or about
 3     November 21st of this year?
 4  A  Yes.
 5  Q  And does that accurately reflect your testimony of some of
 6     the events in this case?
 7  A  Yes.
 8  Q  Okay.  In paragraph four, it says, I did not write the
 9     words rejected on Page 6 of the supplemental application,
10     and if we could turn back to Exhibit B, Page 6.
11  A  Okay.
12  Q  There's that box in the bottom half of the page.....
13  A  Okay.
14  Q  .....and it says your coverage selections and then the
15     words, rejected, are typed in twice on the right-hand side
16     in bold letters and underlined, and that's what you're
17     referring to in paragraph four of your affidavit?
18  A  Right.
19  Q  And you didn't type in those words, did you?
20  A  No, I did not.
21  Q  And there's nothing in this application form that you put
22     in other than those handwritten notations that we've
23     already talked about, is there?
24  A  Right, uh-huh.
25  Q  Okay.  And then you say, I do not recall seeing this
```

Page 29

```
 1     document until recently, it was not with the insurance
 2     documents sent to me by Hartford.  I guess my question
 3     about that is, are you sure, so you don't have a memory of
 4     seeing most of these documents, most of these pages before
 5     and I'm just wondering how you can be certain that you
 6     didn't see Page 6 if you're not sure whether you saw the
 7     pages, even the ones that have your writing on them?
 8  A  Well, because it was important that I have uninsured and
 9     underinsured motorist's so I would have -- I would have --
10     you know, if they'd have sent that I would have seen that.
11  Q  Okay.
12  A  It would have been a very important issue to me.
13  Q  Did you understand at the time what underinsured and
14     uninsured motorist's coverage was?
15  A  Yes.
16  Q  Okay.
17  A  Yes.
18  Q  So it says on Page 6, let's see, under the underlined
19     heading there, one, two, three paragraphs there, it says,
20     uninsured/underinsured motorist's coverage pays benefits
21     for bodily injury, death or property damage caused by an
22     uninsured driver, a hit and run driver, an insured driver
23     whose bodily injury limits, liability limits are
24     inadequate to cover the bodily injury losses incurred, and
25     you understood that that's what UM coverage was?
```

8 (Pages 26 to 29)

Computer Matrix, LLC  
310 K Street, Suite 200  
Phone - 907-243-0668  
Fax    907-243-1473  
jpk@gci.net  
sahile@gci.net

EXHIBIT __1__ PAGE __8__ OF __14__

Page 30

```
 1  A   Right.
 2      MR. KELLEY: But we're not -- you're not trying to get in
 3      the back door.....
 4      MR. MAASSEN: No.
 5      MR. KELLEY: .....that that's the definition he
 6      understood.....
 7      MR. MAASSEN: No.
 8      MR. KELLEY: .....it to be?
 9      MR. MAASSEN: No, I'm not. I'm not.
10      MR. KELLEY: Okay.
11  Q   But if you had seen this definition, you would have
12      understood what it was talking about?
13  A   Yes.
14  Q   I'm not trying to get you to admit that you did see it by
15      that question.
16      MR. KELLEY: Thank you.
17  A   I'm not very well versed in insurance but I understand the
18      concept.
19  Q   Okay. And that's an adequate explanation for your
20      purposes if you had seen it?
21  A   Yes. That would have been very important to me if I had
22      have seen that.
23  Q   Okay. I want to show you the original application, what
24      you have there is a copy.
25      MR. KELLEY: But it parallels what you've got in your hand
```

Page 31

```
 1      there, right? I mean it's -- even though this is a copy and
 2      we're using it as a copy, the original is the -- this is the
 3      complete original -- document, you have the original?
 4      MR. MAASSEN: Yeah, my secretary copied this to make that.
 5      MR. KELLEY: Right. Okay.
 6      MR. MAASSEN: I don't think she pulled any tricks.
 7      MR. KELLEY: No. No. I -- no, no, I know, I just.....
 8      MR. MAASSEN: Yeah.
 9  Q   I'm showing you a different document and just asking you
10      to take a look at it. You can take that clip off if that
11      makes it easier.
12  A   That's okay. This is what we've already looked at, isn't
13      it?
14  Q   That's the original of the document that we looked at a
15      copy of.
16      MR. KELLEY: But see what you're seeing is single, this is
17      all -- this is the document.
18  A   Oh, okay.
19  Q   Does that document appear to be the original of the copy
20      that we've had marked as Exhibit B?
21  A   Yes, it looks like every page is the same.
22  Q   Okay. And that's your signature that appears on Pages 7
23      and 8; is that correct, your signature appears on Pages 7
24      and 8 on that original document?
25  A   Oh, I see what you mean. Yes.
```

Page 32

```
 1  Q   Now, I want to ask you some questions that are more in the
 2      nature of, you know, physical evidence and see if you'll
 3      agree with me about some of the things that I think these
 4      documents show. First of all, would you agree with me
 5      that all four of those pages appear to have been stapled
 6      in the upper right-hand corner?
 7  A   Yes.
 8  Q   And maybe it helps if you look up at the light with it,
 9      but it looks to me as if they were stapled together twice,
10      once straight up and down and once at a slant, can you see
11      that?
12  A   No.
13  Q   Could you look at that and see whether that fits, the way
14      you see it?
15  A   It looks like there's a lot of staples, I don't know.
16      MR. KELLEY: Well, hold it so I can see it. All right.
17  A   I can see the two in the left-hand corner, but.....
18  Q   Okay.
19      MR. KELLEY: At the top.
20      MR. MAASSEN: Don't wreck my original document.
21      MR. KELLEY: No, I won't. Just you got me curious now,
22      now that you got me looking at staple marks, sorry.
23  Q   Well, and let me ask you something else here. There are a
24      couple of fold marks in this. And you can tell that it
25      was tri-folded like this, and I'll let you take a look at
```

Page 33

```
 1      it, but it looks to me as if it was tri-folded and then a
 2      staple was put through the top there, and it looks to me
 3      like those staple marks go through and hit every page.
 4      Could you look at it and confirm whether that's an
 5      accurate description of it.
 6  A   I don't know exactly what you mean, they hit every page.
 7  Q   Yes, you see it was tri-folded just like you have it
 8      there.
 9  A   Oh.
10  Q   And then a staple went through here.
11  A   Yeah.
12  Q   And those staple holes appear in every page including the
13      last page?
14  A   Yeah, it looks like there's a hole there.
15  Q   And does it look as if it goes through every page of the
16      application?
17  A   Yes.
18  Q   Okay. And then again, with regard to the folding, I just
19      referred to it, it looks as if every page was similarly
20      folded in a tri-fold manner, doesn't it?
21  A   Yes.
22  Q   And it also looks as if every page was folded in the
23      middle once like this, they've all got the same, again,
24      the same fold in the middle?
25  A   I don't know. I can see that it was tri-folded, but I
```

JERRY W. MANN                                  12/8/2005                    MANN v. HARTFORD INS.
Vol. 1                                                                        A05-0038 Civil

Page 34

1     don't see that it was folded in the middle.
2 Q  Okay. Well, if you could look at it more closely I'd
3     appreciate it.
4 A  I don't know. It looks like a small crease there but I
5     can -- it looks more like a tri-fold.
6 Q  Uh-huh. But that small crease that you could see, is it
7     true that that appears on every page?
8 A  Yes.
9 Q  Okay. And what I'm getting at with this, as I'm sure you
10    know, now, you acknowledged to me that you received Page 3
11    where your ink and your handwriting appears, correct, and
12    you acknowledged to me that you received Page 4, which is
13    the back of Page 3, so obviously you'd get them both, and
14    you acknowledged to me that you received Pages 7 and 8
15    where your signature appears, and I'm just wondering if
16    you would agree with me that a reasonable assumption would
17    be that all of these pages stayed together through
18    whatever folding and stapling occurred to them during
19    their lifetime.
20 A  I don't know.
21 Q  You don't know?
22 A  I really don't know but......
23 Q  Do you have -- is it your assumption that a couple of
24    these pages, just Page 3 and 4 and Page 7 and 8 were sent
25    to you and the other two weren't? Are you making any

Page 35

1     assumptions that......
2     MR. KELLEY: You're talking about with the -- around --
3     you're talking about around the 4/8/01 date?
4     MR. MAASSEN: Exactly.
5     MR. KELLEY: Yeah.
6 Q  Around 4/8/01 when you saw at least some of these pages
7     and put your ink on them, is it your testimony or your
8     belief that only some of these pages got to you and others
9     did not or is it maybe more likely that you just don't
10    recall which ones you received?
11 A  I just recall the ones that have the checks and my
12    signature.
13 Q  Uh-huh.
14 A  So.....
15 Q  I mean do you actually recall seeing them or do you just
16    realize now, having seen them that you must have seen them
17    since they have your checkmarks on them?
18    MR. KELLEY: Objection to the word, now. Now, today, or
19    now, within since this litigation started?
20    MR. MAASSEN: Now, today.
21    MR. KELLEY: Okay.
22 A  Would you rephrase that please?
23 Q  I don't remember what it was.
24 A  I don't -- I'm getting confused.
25    MR. MAASSEN: Could you remind me what that question was

Page 36

1     please.
2     REPORTER: Sure.
3     (Off record)
4     (Record playback)
5     (On record)
6 Q  Do you mean that you realize you must have seen them
7     because they have your ink on them or do you actually
8     remember seeing them?
9 A  I don't recall Pages 6 and 7. I don't recall seeing them,
10    especially Page 6.
11 Q  Okay. But how about the pages with your ink on them, do
12    you recall seeing them or do you just know now that you
13    must have seen them because they have your ink on them?
14 A  Well, Page 7, obviously I signed there because I wanted
15    collision and comprehensive for rental vehicles, so that
16    was my signature.
17 Q  Right.
18 A  Page 8 was my signature.
19 Q  Right. But I'm asking a different question.
20 A  Okay.
21 Q  I'm not asking whether you realize that you must have seen
22    it, I'm asking whether you now recall having seen it?
23 A  No, I don't recall having seen all those.
24 Q  Okay. Sometime in, I think it was early 2002 your
25    Hartford coverage lapsed because of non-payment premium,

Page 37

1     do you recall that happening?
2 A  I think so, yes.
3 Q  Do you recall why that happened?
4 A  I sent a payment in late.
5 Q  Okay. And how did you discover that the policy had lapsed
6     or that the payment was late?
7 A  They sent me a letter, I think.
8 Q  Do you recall what the letter told you?
9 A  No. Just that -- that I had missed a payment.
10 Q  Okay. Did the payment cross in the mail with their notice
11    to you or did their notice to you prompt the payment?
12 A  I honestly don't recall.
13 Q  Okay.
14 A  I have a feeling I probably just sent the payment in late
15    because I wouldn't have intentionally missed a payment,
16    I've always been very protective of my insurance.
17 Q  Okay. And what was your understanding of what Hartford
18    did once you had made the late payment? What happened to
19    your policy?
20 A  I -- I don't understand what you mean.
21 Q  Okay. Was it your understanding that your policy was
22    reinstated?
23 A  Yes.
24 Q  Okay. Did you expect, at that point, to receive a new
25    policy from Hartford?

10 (Pages 34 to 37)

Page 38

1  A  I didn't know.
2  Q  Did you believe that any of the terms of your policy had
3     changed because of your non-payment?
4  A  I didn't know that either.
5  Q  Okay. Did you ask that it be changed in any way at that
6     point?
7  A  No.
8  Q  Okay. You didn't ask that any coverages be increased or
9     reduced at that point?
10 A  No.
11 Q  Some time, I think a few months later, the policy number
12    was changed on your Hartford auto policy, are you aware of
13    that?
14 A  No.
15 Q  Okay. Did you know at the time that your policy number
16    had been changed?
17 A  No.
18 Q  Do you recall getting anything from Hartford that told you
19    that your policy number had changed?
20 A  No.
21 Q  Do you know today as we're sitting here that your policy
22    number was changed?
23 A  No.
24 Q  In 2004 you called up Hartford and asked for uninsured
25    motorist's coverage on the existing policy, do you recall

Page 39

1     that?
2  A  I think that was when I bought the '95 Suburban to replace
3     the other one.
4  Q  Okay. And when you bought the new Suburban, did you ask
5     specifically for uninsured motorist's coverage?
6  A  I asked for full coverage. I assume that that would be
7     part of it.
8  Q  Okay. Are you aware, I don't want to get into any
9     discussions you've had with your lawyer, but are you aware
10    that there's a tape recording of a call that you made into
11    Hartford to ask for insurance coverage in early 2004?
12 A  No.
13 Q  Okay. I don't want to imply anything sinister, it was
14    just some record that they keep of calls.
15 A  Right.
16 Q  But I won't ask you about it if you don't know about the
17    tape. Did you -- do you recall having any other -- do you
18    recall having other communications by telephone with
19    Hartford about coverages in your policy other than in
20    early 2001 when you first placed the coverage and 2004
21    that we just talked about, were there other calls with
22    Hartford about what coverages were in place?
23 A  Not the coverages, but I made numerous calls in relation
24    to the accident.
25 Q  Okay.

Page 40

1  A  Numerous calls, but there was nothing about the policy.
2  Q  Was there one person at Hartford that you did most of your
3     talking to about the claim, the accident itself?
4  A  Yes.
5  Q  And do you recall the name of that person?
6  A  No.
7  Q  Okay. And how did you find out who to call about the
8     accident at Hartford? Did you call your.....
9  A  There was a number listed on the policy, I think, and I
10    called that number and they gave me this person's number
11    to -- to talk with.
12 Q  Okay. Let me give you just one more document here.
13    MR. KELLEY: D.
14    MR. MAASSEN: D.
15    REPORTER: Here you go, D.
16    MR. MAASSEN: Thank you.
17    REPORTER: Uh-huh.
18              (Deposition Exhibit D marked)
19 Q  This is D, and actually I'll.....
20    MR. KELLEY: Is this the whole thing, there's two pages,
21 all one sheet of paper, or one.....
22    MR. MAASSEN: I'll give you the original two in case you
23 want to check that against the copy but we'll make the copy the
24 exhibit.
25    MR. KELLEY: Yes, that's fine. But can I see it.

Page 41

1  A  Oh, I'm sorry, Len.
2     MR. MAASSEN: And actually I see the way I have these
3  pages ordered they're backwards, the signature page should be
4  the second page.
5     MR. KELLEY: Page 1 is -- oh, okay.
6  Q  And that's your signature that appears on this exhibit?
7  A  Yes.
8  Q  And it's dated March 1 of '04; is that correct?
9  A  Correct, uh-huh.
10 Q  Do you recall what it was that this document addressed?
11 A  No.
12 Q  Okay.
13    MR. KELLEY: If you want to refresh his memory even more,
14 I don't object. Assuming it can be refreshed.
15 A  Is that when they reinstated my insurance, you said it was
16    reinstated or something or.....
17 Q  I was talking about the lapse in your coverage then which
18    was in 2002. Sometime after your accident you realized
19    that Hartford was claiming that you didn't have uninsured
20    motorist's coverage; is that correct?
21    MR. KELLEY: He put that -- no, wait a minute, a question
22 to you Jerry.
23 A  Oh, okay.
24 Q  Was that a correct statement, sometime aft.....
25 A  Yeah.

11 (Pages 38 to 41)

JERRY W. MANN  12/8/2005  MANN v. HARTFORD INS.
Vol. 1  A05-0038 Civil

Page 42

1 Q I'll just repeat it so we're clear for the record.
2 A Please.
3 Q Sometime after your accident in.....
4 A Right.
5 Q .....2003, you realized that Hartford was contending that
6   you didn't have uninsured motorist's coverage; isn't that
7   correct?
8 A That's correct.
9 Q And did that prompt you to call Hartford and inquire about
10   it?
11 A I don't recall that I called them.
12 Q Okay. Did you have some communication with Hartford
13   yourself, not through your lawyer, but, yourself, after
14   your accident about the existence of uninsured motorist's
15   coverage in your policy?
16 A I don't -- I don't recall that, no.
17 Q Okay.
18 A I just assumed that I -- I had uninsured motorist's
19   so.....
20 Q Okay.
21 A Is this for me to keep?
22 Q No, it's actually for the court reporter to keep.
23 A Okay.
24 Q I do have extra copies of everything if you want them.
25 A No, no, that's okay.

Page 43

1 Q Okay. You can always get them from Mr. Kelley who keeps
2   impeccable files.
3   MR. KELLEY: Sure.
4 Q If I could just take a minute here, are you doing all
5   right?
6 A Yeah.
7 Q Whatever it was that you received in the mail from
8   Hartford, whether it was, you know, this document that
9   we've marked as Exhibit B or part of it or, you know,
10   select pages of it or whatever, do you recall whether you
11   actually read through it? Would that have been your
12   practice to have read through it?
13 A I would have sort of skimmed through it, I wouldn't.....
14 Q Okay.
15 A .....I mean those things are so much terminology in it
16   but.....
17 Q Right. But would you have read enough of it to get the
18   gist of what it was you were signing, at least to your
19   satisfaction?
20 A Possibly. Often times I sign things like that with -- I
21   mean it's about that thick, probably, so.....
22 Q When you say it was like that thick, what are you
23   recalling?
24 A I don't know, whatever it was they sent me that I signed,
25   I -- well, actually they sent me a policy, I suppose, that

Page 44

1   I didn't sign; is that -- is that what you're talking
2   about?
3 Q No, I'm just wondering what it was that -- what I thought
4   they sent you was this Exhibit B and so I wouldn't think
5   that it'd be more than those pages there but if you think
6   that it was I'd like to hear about that?
7 A Oh, I don't know, I thought you were talking about the
8   actual policy.
9 Q No. They did send you a policy, eventually, an actual
10   policy?
11 A Yes.
12 Q Okay.
13   MR. MAASSEN: I don't think I have any other questions for
14   you.
15   REPORTER: Len.
16   MR. KELLEY: Okay, off record a minute.
17   (Off record)
18   (On record)
19         JERRY W. MANN
20 testified as follows on:
21         CROSS EXAMINATION
22 BY MR. KELLEY:
23 Q Would you take a look at Exhibit No. C, and I don't even
24   want to talk to you anyplace about it, let's just do it
25   right here, it speaks for itself and your signature's on

Page 45

1   here, right?
2 A Right.
3 Q Mr. Maassen was asking you some questions about a period
4   of time where your policy, where you were advised that the
5   policy was going out of effect and you think you sent in a
6   payment late?
7 A Right.
8 Q Would you tie together what you said in number 5, and if
9   you need his glasses, put them on, because I don't want
10   you saying anything that's not accurate.
11 A Yes, that's -- that's a true statement, yes.
12 Q But you left the impression that the payment might have
13   been missed in the mail or maybe you paid the payment
14   late.
15 A Yeah.
16 Q And there was no, quote, cancellation, or anything like
17   that, how should we deal with that, assuming that that's
18   what you did imply earlier?
19 A Well, they apparently got my payment late and it says here
20   Hartford cancelled my insurance but then they didn't.....
21 Q But this is you saying that.....
22 A .....really cancel it -- yeah.
23 Q .....you understand that?
24 A Yeah. Yeah.
25 Q Is there anything -- can you -- how do you deal with this,

12 (Pages 42 to 45)

JERRY W. MANN    12/8/2005    MANN v. HARTFORD INS.
Vol. 1                        A05-0038 Civil

Page 46

```
1    how -- okay. Did you fail to make a premium payment?
2  A Apparently I did, yes.
3  Q Well, you got to understand that this is prepared based
4    upon what you understand. If you sent a late payment in,
5    then this would not be accurate.
6  A Well, then I missed a payment I suppose.
7  Q You don't have to agree with me.
8  A Yeah.
9  Q You either did or you didn't.
10     MR. MAASSEN: Or you didn't remember, maybe.
11 Q Yeah.
12 A I don't -- I don't recall why the payment didn't get there
13    but -- but they re -- reinstated my insurance.
14 Q Okay. Okay. That's basically just.....
15 A Yeah.
16 Q Okay. Now, let's go to this down here, this would be this
17    document here, Exhibit D, and we're talking about number
18    7, read 7 and put it together with number D and Mr.
19    Maassen asked you a couple times, do you remember how this
20    came to pass, how did D come to pass? If you don't
21    remember or don't -- fine, it's not necessary that you do,
22    I just want to make sure that we've at least -- you know,
23    you're together with what you think really happened.
24 A Yeah. This is a form they sent me.
25 Q But how did it get to you?
```

Page 47

```
1  A It was when they reinstated my insurance, I'm sure, and I
2    just indicated -- signed it and.....
3  Q Okay.
4  A I'm missing the point, Len, I'm sorry.
5  Q No, no, no, no, it's fine, Jerry. I've known you so
6    doggone long, it's okay.
7     MR. KELLEY: No further questions. If that brought up
8  anything you want to go to, go.....
9     MR. MAASSEN: It didn't.
10    REPORTER: No?
11    MR. MAASSEN: No.
12    MR. KELLEY: Okay.
13    REPORTER: All right, then we're off record.
14    (Off record)
15        (END OF PROCEEDINGS)
```

Page 48

```
1              CERTIFICATE
2  UNITED STATES OF AMERICA)
                           )ss
3  STATE OF ALASKA         )
4     I, Joseph P. Kolasinski, Notary Public in and for the
5  State of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8     That said testimony was taken at the time and place
9  therein stated;
10    That the testimony of said witness was recorded
11 electronically and thereafter transcribed under my direction
12 and reduced to print;
13    That the foregoing is a full, complete, and true record of
14 said testimony.
15    I further certify that I am not a relative, nor employee,
16 nor attorney, nor of counsel of any of the parties to the
17 foregoing matter, nor in any way interested in the outcome of
18 the matter therein named.
19    IN WITNESS WHEREOF I have hereunto set my hand and affixed
20 my seal this 10th day of December 2005.
21
22          _____
            Joseph P. Kolasinski, Notary Public
23          In and for the State of Alaska.
            My Commission Expires: 03/12/2008
24
25
```

Page 49

```
1           WITNESS CERTIFICATE
2  RE: MANN v. HARTFORD
   CASE NUMBER:   A05-0038 (RRB)
3  DEPOSITION OF: JERRY W. MANN
   DATE TAKEN:    DECEMBER 8, 2005
4
   I hereby certify that I have read the foregoing deposition
5  and accept it as true and correct, with the following
   exceptions:
6
   Page   Line          Description
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
   If additional paper is needed, please sign and date each sheet.
23
24     _____    _____
       JERRY W. MANN                DATE
25
```

13 (Pages 46 to 49)

Page 48

```
 1                    C E R T I F I C A T E

 2    UNITED STATES OF AMERICA)
                              )ss
 3    STATE OF ALASKA         )

 4         I, Joseph P. Kolasinski, Notary Public in and for the

 5    State of Alaska, residing in Anchorage in said state, do hereby

 6    certify that the deponent in the foregoing matter was duly

 7    sworn to testify to the truth, and nothing but the truth;

 8         That said testimony was taken at the time and place

 9    therein stated;

10         That the testimony of said witness was recorded

11    electronically and thereafter transcribed under my direction

12    and reduced to print;

13         That the foregoing is a full, complete, and true record of

14    said testimony.

15         I further certify that I am not a relative, nor employee,

16    nor attorney, nor of counsel of any of the parties to the

17    foregoing matter, nor in any way interested in the outcome of

18    the matter therein named.

19         IN WITNESS WHEREOF I have hereunto set my hand and affixed

20    my seal this 10th day of December 2005.

21

22                                 _____

                                   Joseph P. Kolasinski, Notary Public
23                                 in and for the State of Alaska.

                                   My Commission Expires:  03/12/2008
24

25
```

[Notary Public seal: JOSEPH P. KOLASINSKI, NOTARY PUBLIC, STATE OF ALASKA]